### Sanitary Water Board v. Blue Coal Corporation

*Carl L. Meese,* for Commonwealth.

*Frank B. Gelder, Bernard J. Brown* and *S. Joseph Moomaw,* for appellant.

KREIDER, P. J., December 14, 1971.—This is a stream pollution case arising out of the operation of a coal mine. The Sanitary Water Board[1] of the Commonwealth of Pennsylvania petitioned this court for a rule upon respondent Blue Coal Corporation and its president and vice president to show cause: 1. Why they should not be adjudged in contempt of court for failing to comply with an agreed order of court providing for the construction and operation of facilities for the treatment of water discharged from the company's mine; and 2. why the court's supersedeas order of July 10, 1970, should not be revoked.

In its answer the Blue Coal Corporation (hereinafter sometimes called "Blue Coal") denied the material allegations of the show-cause petition and requested that the supersedeas remain in effect. It also denied that its president and vice president were properly named respondents. A two-day hearing was held by the court and extensive testimony was presented by the parties.

The present case originally came before this court[2] upon the appeal of Blue Coal from the adjudication and order of the Pennsylvania Sanitary Water Board made February 5, 1970. It involves the Board's revocation of its permit no. 168M006 issued to Blue Coal Corporation for a water treatment plant at appellant's Wanamie No. 19 mine in Newport Township, Luzerne County, Pa., where about 400 men are employed.

---

[1] On January 19, 1971, the Department of Environmental Resources was established and it is now exercising the powers and duties formerly exercised by the Sanitary Water Board and Department of Health.

[2] Prior to the creation of the new Commonwealth Court by the Act of January 6, 1970, P. L. 434, 17 PS §211.1, which became effective upon the Governor's proclamation issued September 1, 1970.

Water from the treatment plant is discharged into Newport Creek which is a tributary of the Susquehanna River.

At the time of filing its appeal, Blue Coal filed exceptions to the board's adjudication and order. That order is as follows:

"AND NOW, to wit, this 5th day of February, 1970, it is ordered that:

"1. Permit No. 168M006 is hereby revoked effective May 5, 1970, unless prior to that time the Department of Health has certified to the Sanitary Water Board that it has reviewed the operation of the treatment facilities at the Wanamie #19 mine and has found:

"a. That the treatment facilities are adequate to prevent a pollutional discharge to waters of the Commonwealth, and

"b. That the operation of the facilities by Blue Coal Corporation is sufficient to insure that any discharge to waters of the Commonwealth will meet Sanitary Water Board standards as set forth in the Board's Rules and Regulations and in the permit.

"2. The Department of Health shall review the treatment facilities and operation thereof at the Wanamie #19 mine and shall, by April 5, 1970, advise Blue Coal Corporation in writing of its findings noting any deficiencies in the facilities or in their operation. The Department shall also notify the company in writing of any subsequent findings it makes with respect to the facilities or their operations."

After filing its appeal, Blue Coal also filed a petition for a supersedeas. On May 4, 1970, the court granted a temporary supersedeas and set July 10, 1970, as the time for a hearing to determine whether the supersedeas should be continued. During the week of June 22, 1970, oral argument was presented before the court en banc on the merits of the appeal. However, on July

10, 1970, the court *at the request of the parties* entered an order continuing the supersedeas of May 4, 1970, conditioned upon compliance with certain conditions set forth in a pollution abatement program and a construction schedule prepared by Blue Coal Corporation and made a part of the supersedeas by reference. At the suggestion of counsel for the parties the following paragraph was incorporated in the supersedeas order:

"4. At any time either party may request the Court for modification of the order granting the supersedeas or for other appropriate relief. Pending such request it is understood that the Court may withhold rendering a decision in the appeal from the Board's adjudication."

On October 28, 1970, the Commonwealth filed a petition requesting the court to render a decision on the merits of the appeal and also requesting the court to grant a rule upon Blue Coal Corporation and its President, Thomas J. Gillen, Jr., and its Vice President, Charles G. Zink, to show cause why they should not be adjudged in contempt for failing to comply with the supersedeas order of July 10, 1970, and why the supersedeas should not be revoked. On January 26 and 27, 1971, as above stated, a hearing was held to determine whether the rule to show cause should be made absolute.

As indicated, the following are the

## QUESTIONS INVOLVED

1. Are appellant Blue Coal Corporation and its president and vice president in contempt of this court?

2. Should the supersedeas issued July 10, 1970, be revoked?

After full and careful consideration of the evidence presented at the hearing held by this court on January 26 and 27, 1971, to determine these questions, we make the following

586

## FINDINGS OF FACT

1. Neither party requested a modification of the July 10, 1970, supersedeas order or other appropriate relief until the Sanitary Water Board of the Commonwealth of Pennsylvania filed the instant petition on October 28, 1970.

2. The July 10, 1970, order referred to a pollution abatement program and a construction schedule for water treatment facilities, hereinafter sometimes referred to as the "water treatment plant," at Wanamie No. 19 mine. The said construction schedule was an integrated schedule, setting forth June 25, 1971, as the complete installation date, which schedule was predicated upon normal weather and working conditions. Blue Coal's obligation to meet the dates set forth in the schedule was expressly "subject, however, to conditions and circumstances beyond the control of Blue Coal, including, but not limited to, the availability of materials, equipment and machinery, weather conditions permitting construction, and the availability of manpower to do the work."

3. The only substantial issue in the instant proceeding is the manner of Blue Coal's compliance with the schedule relative to the water treatment plant at the Wanamie No. 19 mine.

4. Blue Coal Corporation appears to have completed more than 50 percent of the water treatment plant on September 15, 1970, well before November 23, 1970, but on that date had not been able to secure and install a lime slaker and sludge removal system which it had ordered on May 22, 1970, from Barrett, Haentjens and Company of Hazleton, Pa. The lime slaker and sludge removal system had not been delivered on January 27, 1971, when testimony was completed in this case.

5. Blue Coal Corporation apparently has made every effort possible to proceed diligently to comply

with the order of this court of July 10, 1970, and the construction schedule for the water treatment plant at Wanamie No. 19 mine, but has been seriously hampered by unexpected and unforeseeable problems as follows:

(a) the delay in delivery of the lime slaker, rotameter, grit remover, pump and other parts of a sludge removal system required to be specially manufactured by Barrett, Haentjens and Company of Hazleton, Pennsylvania.

(b) a shortage of available equipment and machinery as well as experienced operators and other manpower necessary to do the work.

(c) unforeseeable conditions at Wanamie No. 19 such as large deposits of old sewage and sand, not readily ascertainable when the work was started, and which must be removed in order to furnish a firm foundation for the lagoons.

(d) an emergency at the Huber operation of Blue Coal Corporation, where, in order to comply with a mandate from the Department of Health, Blue Coal moved certain equipment and men from Wanamie No. 19 mine to the Huber mine and constructed lagoons, which construction at Huber required about 10 weeks and an expenditure of between $125,000 and $130,000 and delayed the work at Wanamie No. 19 mine.

(e) an unforeseeable problem of sludge removal at Wanamie No. 19 mine.

6. In its effort to comply with orders of the Department of Health, the Blue Coal corporation has already expended $300,000 on the construction of the water treatment plant at Wanamie No. 19 mine, has obligated itself for $86,000 more for the lime slaker and sludge removal system ordered from Barrett, Haentjens and Company and has spent $10,000 per month

for 20 months or $200,000 for the operation of the plant. The evidence also indicates that the total expenditure for the construction of the plant at Wanamie No. 19 mine will be at least $500,000. Blue Coal has also expended an additional $125,000 to $130,000 at its Huber operation to construct lagoons required by the Department of Health.

7. Blue Coal failed to complete fully the construction schedule relating to Wanamie Mine No. 19 and as a result of such failure mine drainage continues to be discharged into the waters of the Commonwealth contrary to the discharge standards (relating to iron) established by the Sanitary Water Board.

8. In constructing and operating the water treatment plant, Blue Coal Corporation has had the benefit of the advice and services of an independent consultant, Dr. Ralph B. Rozelle, Professor of Chemistry at Wilkes College, Wilkes Barre, Pa., who has made elaborate studies in the field of water pollution. Dr. Rozelle testified that there is no other plant in the anthracite region as large as the plant at Wanamie No. 19 mine and that from the standpoint of removing acid in the mine water its water treatment plant has been operated at 100 percent efficiency in treating the water so that it would be within the normal limits having a pH of 6.0 to 9.0 and the water being discharged in the effluent from the plant is within the acceptable standards[3] of the Department of Health.

---

[3] Dr. Rozelle defined the term "pH" as follows: ". . . the small letter 'p' which precedes the capital 'H'. This is what it is: The small letter 'p' is not an abbreviation. It means as Mr. Bercheni indicated, it is a mathematical term. It is the negative log of whatever follows it. The 'negative log of' is a mathematical term. This happens to be a capital 'H' following it so it means the negative log of the hydrogen ion concentration. . . .

"THE WITNESS: The hydrogen ion concentration has been *used* in the past *as a measure* of whether a water or aqueous

9. In the removal of iron from the water, the efficiency has ranged from 80 percent to 93 percent and there have been times when it was as high as 99 percent efficient.

10. The maximum allowable limit on total iron to be discharged from the Wanamie No. 19 mine treatment plant is seven milligrams per liter (mg./1 or less, N.T. 13, 18, 22).

11. When the facilities were operated at a maximum efficiency, the iron concentration "ranged . . . around 20 milligrams per liter of the concentration. But they have been higher than that."

12. Any effluent coming from the Wanamie No. 19 mine water treatment plant is discharged into the Newport Creek, a stream containing untreated sewage, which flows into the Susquehanna River where there are large quantities of untreated sewage and acid mine water.

13. Untreated sewage is being discharged into the Susquehanna River at a point above the confluence of the Susquehanna and Newport Creek by some 32 municipalities and large quantities of acid mine water are also being discharged into the Susquehanna from abandoned mines[4] and pumps of the Commonwealth

solution of a particular material was acidic or alkaline. If a material has a pH of 7, it is considered to be neutral in these terms. For instance, blood has a pH of 7.2. It is close to neutral.

"If the pH is above 7, the material is considered to be either alkaline or basic like lye. If the material has a pH below 7, such as vinegar, then the material is considered to be acidic. Vinegar has a pH of around 3, something of this nature."

[4] For an illuminating description of pollution problems arising from acid mine drainage in the anthracite coal regions of Pennsylvania, see the report of studies by Gannett, Fleming, Corddry and Carpenter, Inc., Consulting Engineers, quoted in part in Sanitary Water Board v. Glen Alden Corp., 83 Dauphin Co. Reports, 108, at pp. 112-114 (1964).

of Pennsylvania at the Delaware Shaft north of Wilkes Barre.

14. Mr. Louis W. Bercheni, Regional Sanitary Engineer for the Pennsylvania Department of Environmental Resources, testified that if the facilities that were to be installed by November 23, 1970, in accordance with the schedule approved July 10, 1970, had been completed, they would have met "the standards of the permit or the standards of the Department of Environmental Resources, at that time the Sanitary Water Board."

15. Mr. Bercheni further testified: ". . . the overall compliance date for all of the facilities would have been May 24, 1971, but the November 23, 1970, date was the date they were to have at least one half of the entire system in operation," and that it was not complied with.

16. June 25, 1971, is the last date set forth in the construction schedule. By that time the excess sludge was to have been removed from lagoon no. 2 and polishing lagoon no. 2.

## DISCUSSION

The Sanitary Water Board, now acting through the Department of Environmental Resources, asks this court to find appellant, Blue Coal Corporation, its president and vice president, guilty of contempt of court, to impose a fine on each of them and to revoke the supersedeas of July 10, 1970, which all parties requested the court to issue after the case had been argued on its merits before the court en banc.

The petition to revoke the supersedeas and for contempt was filed October 28, 1970, only three months and about three weeks after the supersedeas was granted.

By letter dated August 20, 1970, Vice President Zink wrote to Mr. Bercheni at Kingston, Pa. as follows:

"Further, with regard to progress versus Wanamie No. 19 construction schedule, we:

"1. Placed order for lime slaker, sludge pumps and system.

"2. Started cleaning sludge from Lagoon No. 2.

"3. Started changing lime bin—waiting for certified prints on lime slaker.

"4. Changes to aeration piping—will start as soon as sludge is removed and dike dressed.

"5. Polishing Lagoon No. 2—surveyed—temporarily delayed due to construction of Lagoon at Huber—will start as soon as possible.

"We trust that you will find everything in order, otherwise, please advise."

On September 25, 1970, Franklin B. Gelder, Vice President and General Counsel of the Blue Coal Corporation, wrote to William M. Gross, Assistant Attorney General, in regard to the construction schedule as follows:

"For your information, I am sending you a copy of Charles G. Zink's report of August 20, 1970 to Mr. Bercheni concerning the construction schedule.

"Since then the sludge has been removed from Lagoon No. 2—the lime bin has been completed pending delivery of the equipment. The change to the aeration piping has been started now that the sludge has been removed. Polishing Lagoon No. 2 has been started and we expect it to be completed prior to December 14, 1970, which is the current delivery date scheduled by the manufacturer of the equipment.

"I believe this clears up the discussion concerning Items 3, 4 and 5 which we originally scheduled for July 15, 1970.

"As to the September 1, 1970 date under the construction schedule:

"Item 1—The sludge removal has been completed.

"Item 2—We have started the preliminary work to build the dike barrier which we expect to be fully completed in three to four weeks.

"Item 3—The discharge (transfer) in the dike barrier in Lagoon No. 2 will be done during the construction of the dike barrier."

It is not necessary to recapitulate the evidence presented at the court hearing. We have read, re-read and considered it all, as well as the testimony originally taken before the Sanitary Water Board. While there has been some delay in the construction program and failure to send formal written reports to the Sanitary Water Board in Harrisburg, we are convinced that the board received adequate reports from its regional sanitary engineer, Mr. Bercheni, at Kingston. The latter testified:

"We have been in relatively constant contact at Wanamie No. 19."

Nevertheless, we do not condone the company's failure to submit regular written reports to the home office of the board. Had it done so, some of the misunderstandings of the parties might have been averted.

In considering the overall picture, the testimony of Doctor Ralph B. Rozelle, Professor at Wilkes College, is not to be treated lightly. He is a recognized expert, author and lecturer on acid and iron mine drainage and has been under contract with the Pennsylvania State Department of Mines and the United States Public Health Service. He is a chemical consultant to Blue Coal and a number of other organizations. Dr. Rozelle testified he has been closely allied with the construction and operation of the Wanamie Mine

plant in question and analyzes its discharges "three or four sometimes five times a week."

He further testified that he was familiar with the construction schedule embodied in the court's supersedeas order of July 10, 1970, and that to the best of his knowledge Blue Coal Corporation has done everything in its power to adhere to the schedule and "work out the problems of the Wanamie Mine No. 19 operation."

The court must also take into consideration the fact that although Blue Coal submitted a timely order for a lime slaker, sludge pumps and other equipment which had to be manufactured specially, delivery had not been made at the time of the hearing January 26, 1971.

Moreover, the Commonwealth concedes that the transfer of certain equipment to the Huber Coal Washery pursuant to the request of the Pennsylvania Department of Health, delayed work on Primary Lagoon No. 2 and on Polishing Lagoon No. 2. The Commonwealth contends, however, that this was not responsible for other delays in complying with the construction schedule. Blue Coal denies this. The fact remains, nevertheless, that this heavy equipment was required to be used at the Huber plant for about 10 weeks and undoubtedly was a substantial cause of the company's inability to comply fully with its construction schedule. The return of the equipment from Huber to Wanamie Mine No. 19 seems to have occurred about the same time that the instant petition for a rule to show cause was filed on October 28, 1970.

In view of all the evidence, we conclude that respondent Blue Coal Corporation, Thomas I. Gillen, Jr., president, and Charles G. Zink, vice president, have sustained their burden of establishing sufficient facts and circumstances to constitute a valid excuse for their failure to complete the construction schedule

at the specified time. Consequently, they are not in contempt of our supersedeas order of July 10, 1970.

We are of the opinion that the supersedeas should not be revoked at this time and that the court should retain jurisdiction of the case. The Sanitary Water Board correctly states in its brief that "the effect of the Supersedeas contained in the July 10, 1970 Order was that the parties were to proceed as though Blue Coal's Permit No. 168M006 was never revoked . . ." That order, however, was conditioned upon Blue Coal's bona fide compliance with its pollution abatement program and construction schedule and the board justifiably relied thereon.

This court has no recent information as to the present status of the Blue Coal pollution abatement program and construction schedule. We are reluctant to believe, however, that a company which installed a water treatment plant at an initial cost of more than a quarter million dollars would now default on its promise to the Commonwealth. Moreover, we are certain the company is mindful of the serious results which would follow if Wanamie Mine No. 19 were forced to close with the consequent loss of support for about 400 of its employes and their families. It is possible that this dire result may be avoided if faithful adherence is given by all parties concerned to the spirit as well as the letter of the agreements in question.

## ORDER

And now, December 14, 1971, the rule to show cause why the Blue Coal Corporation, Thomas I. Gillen, Jr., president, and Charles G. Zink, vice president, should not be held in contempt of court is discharged.

The said rule to show cause why the supersedeas order of July 10, 1970, should not be revoked is discharged upon condition that the Blue Coal Corpora-

tion (1) complete within a reasonable period the work described in its pollution abatement program and construction schedule dated July 10, 1970; (2) file within 30 days of the date of this order a progress report with the Pennsylvania Department of Environmental Resources in its office at Harrisburg, Pa., together with a copy thereof in the Department's regional office at Kingston, Luzerne County, Pa., and also a copy in the office of the Attorney General of the Commonwealth; and (3) file monthly a supplemental progress report in the offices aforesaid, beginning one month after the filing of the initial report directed herein.